**THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| LARRY NASON and PRENTISS TATE, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GENERAC POWER SYSTEMS INC.; including other affiliated entities and individuals,<br><br>Defendant. | Civil Action No. 26-cv-5559<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Larry Nason and Prentiss Tate (Plaintiffs), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following based on personal knowledge as to their own acts and based upon the investigation conducted by their counsel as to all other allegations:

## NATURE OF THE CASE

1. This class action seeks damages and equitable relief arising from Generac Power Systems Inc.'s ("Generac" or "Defendant") false and misleading representations regarding the safety of their portable generators (collectively, "Products").

2. Defendant manufactures and/or imports, markets, and distributes residential and industrial generators under the Generac brand name.

3. Accordingly, Defendant is responsible for the design, manufacture, marketing, and sale of the Products at issue.

4. On its website, Generac presents itself as "the #1 manufacturer of home backup generators" and "the first to engineer affordable home standby generators, along with the first engine developed specifically for the rigors of generator use".[1] On the Generac website, Defendant touts "we protect the things that power your life by providing quality, affordable power solutions" and that its residential standby generators are "designed for durability and efficiency."[2]

5. By way of example, Defendant touts their generators as "Portable power when you need it," including power outages as displayed by a storm:[3]




[1] https://www.generac.com/about/ (last accessed May 7, 2026)
[2] Id.
[3] https://www.generac.com/residential-products/portable-generators/6500-portable-generator-with-cosense-49st-76803/ (last accessed August 31, 2026)

6. Similar messages are presented to customers as the point of sale. For example, Defendant will use in store displays with prominent phrases such as, "Backup power you need, when youneed it most."



7. In-store signage includes statements like " Essential Backup | Storm Response". *See Id.*

8. Other signage includes phrases like "Power the essentails during an outage," along side a "Storm Ready" icon presented against the image of a lit home against a dark sky with lightning.



9. Further reinforcing these messages are catalogs included on the shelf beside the products:







10. These catalogs contain additional information reinforcing the quality and essential nature of these products, including in dangerous situations such as adverse weather. For example, the cover displays a lit home against a dark sky with storm clouds and lightning in the background. *See* Exhibit A at 1.

11. The first page of the catalog sets the stage for why having backup generators that function are so important, stating

> Life changes when utility power fails. During a power outage your home has no lights, heat or central air. Your refrigerator, microwave, laundry equipment, internet and television are rendered useless. We tend to take these conveniences for granted because they're always available. **But what happens when they're not?**
>
> Power outages have become more prevalent and problematic in recent years, especially in an increasingly connected world . Outages can also be costly. If you lose power for an extended period of time, you could be forced to pay for hotel fees, replacement of spoiled food, burst pipes or mold remediation.

*See* Ex. A at 2.

12. This is then followed by a pie chart entitled "Outage Overview," and showing 61.3% of outages are attributable to "Strong Storms." *Id.* The source of this information is "Generac Research January 2021 – October 2023." *Id.*

13. These warning are then immediately followed by the statement:




*Id.*

14. The catalog continues by stating, "You may be considering a portable generator for use during power outages. We are the leading manufacturer and distributor of portable generators and they can certainly be used to provide backup power…" *Id.* at 3.

15. The catalog further states, "Generac's line of portable generators offers affordable reliability and options for home use, camping, job site or outdoor events. Power the fun stuff or cover an emergency, the wide range of sizes gives you the flexibility to choose as much power as you need." *Id.* at 8. It goes on to state, "Portable generators deliver power hwere you need it most. Take charge, even when the power fails. When your backup opower solution is a Generac portable generator, you can stay secure—and take that comfort wherever you go." *Id.*

16. The catalog even provides the "Running Watts" and "Additional Starting Watts" for items such as a "Refrigerator" and "Sump Pump." *Id*. at 8.

17. These messages are further reinforced on the packaging of the products. For example, one product states prominently on the front of the packaging, "Large-Capacity Steel Fuel Tank[.] With incorporated fuel gauge provides durability and up to an 11.5 hour run-time at 50% load."



18. The same packaging also describes the recommended uses, including refrigerators:



19. Nowhere on any of the packaging does Defendant make any statement about leaking fuel or faulty carburetors.

20. Defendant represented that the Products were safe and reliable, despite being aware that design and manufacturing defects rendered them hazardous.

21. As a direct result of these misrepresentations, Plaintiffs and Class Members purchased defective Products that failed to perform as advertised and posed a substantial risk of serious injury.

22. Indeed, the Products contain an identical dangerous defect. Specifically, the Products' generator leaks fuel, posing a serious risk of injury or death from fire and burn hazard. (the "Defect"). [4]

23. Defendant has been aware of the Defect, which is dangerous, having received 114 reports of generator fuel leaks.[5]

24. On April 16, 2026, the U.S. Consumer Product Safety Commission ("CSPC") announced a nationwide recall of Generac portable generators sold at Home Depot, Lowe's and other home improvement and hardware stores and online (the "Recall").[6]

25. In addition to the Recall, consumers have been instructed to "immediately stop using" the Products.

26. As shown on their website, Defendant represented which products were affected by the recall[7]:

---

[4]https://www.generac.com/about/recalls/portable-generator-fuel-leak/?id=M-00000152&dealer=True&catagories=4#top (last accessed May 7, 2026)

[5] https://www.cpsc.gov/Recalls/2026/Generac-Power-Systems-Portable-Generators-Due-to-Risk-of-Serious-Injury-or-Death-from -Burn-and-Fire-Hazards (last accessed May 7, 2026)

[6] Id.

[7] https://www.generac.com/about/recalls/portable-generator-fuel-leak/?id=M-00000152&dealer=True&catagories=4#top (last accessed May 8, 2026)




**Recalled Generac Portable Generator GP8000E, model G0077150**



**Recalled Generac Portable Generator GP6700E DF, model G0080620**



Recalled Generac Portable Generator GP6500E DF, model G0081530




Recalled Generac Portable Generator GP6500, model G0076802




**Recalled Model and Serial Number Location– models G0077210, G0081550, G0081530, G0080620, G0080630**




**Recalled Model and Serial Number Location – models G0076802, G0076722, G0077130, G0077150, G0076754, G0081540, G0079712**

27. Consumers who purchased the Products learned through the Recall notice, or by contacting Defendant, that the Products posed a serious safety hazard requiring significant corrective action.

28. Defendant refuses to provide refunds for their defective Products. Instead, consumers' only option is to attempt to locate a Generac dealer somewhere and arrange for a free repair, which requires owners to invest substantial time, effort, and travel. These corrective measures impose considerable burdens on consumers and result in meaningful expenses. The repairs can take several weeks, leaving consumers without backup generators for significant periods of time.

29. The Recall is also inconsistent with general industry practices because Defendant failed to offer refunds as an alternative to repairs when their products were recalled. This option incentivizes consumers to surrender their dangerous products pursuant to the Recall, thereby

getting more of the dangerous products out of circulation. Defendant has decided not to follow prevailing industry standards. Instead, Defendant implemented a half-hearted Recall that allows them to say they are doing the right thing, while protecting their bottom line.

30. Based upon the foregoing, and by selling dangerously defective Products, Defendant has violated the Uniform Commercial Code's "(UCC") warranty provisions, violated consumer protection statutes, has been negligent, and has been unjustly enriched.

31. As a result of the foregoing, Plaintiffs and the Class Members have suffered damages.

## JURISDICTION AND VENUE

32. This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the proposed Class who are diverse from Defendant (including Plaintiffs), and (4) there are more than 100 proposed Class members.

33. This Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself to the law, rights, and benefits of the State of Illinois.

34. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (a)(1) because many Class Members reside in the Northern District of Illinois, and throughout the state of Illinois. Moreover, a substantial part of the events or omissions giving rise to the Classes' claims occurred in this district.

## PARTIES

35. Plaintiff Larry Nason is a resident and citizen of Country Club Hills, Illinois. On July 28, 2026, Mr. Nason purchased a Generac generator, Model GP 6500, from Menards in

Shererville, Indiana. Mr. Nason purchased the generator for personal use, and intended to use it as a backup generator in case of storms.

36. Upon bringing the unit home, he put in approximately a quart of gasoline, which poured through the unit and onto the floor. The gasoline was no longer usable. Mr. Nason contacted Defendant. He was informed of the Recall, and told to bring the unit to Kings Power Equipment in Steger, Illinois, which he did on July 29, 2026. He was told it would take 5 weeks to get the generator back, in part, because there were so many recalled Generac generators requiring repair. As of the date of filing, Mr. Nason still does not have the generator, and was told it could be severl more weeks before he would receive the generator.

37. Between July 29, 2026, and the date of filing this complaint, two tornadoes came through the area in which Mr. Nason lives. As a result, he lost power. Because he lost power and did not have the generator, his sump pump stopped working and his basement flooded. Two doors were warped by the flooding. Mr. Nason has purchased replacement doors for approximately $150 each. Equally, because he lost power and did not have the generator, his fridge and freezer quit running and Mr. Nason lost approximately $375 worth of food to spoilage.

38. Plaintiff Prentiss Tate is a resident and citizen of Wall, Mississippi. Wall is located within DeSoto County, Mississippi.

39. Similar to Mr. Nason, Mr. Tate also purchased one of these generators for personal use. Tate also brought the generator home and fueled it with gasoline to test it. Following this test, Tate found that gasoline had leaked from the generator and onto his floor. The gasoline was no longer usable.

40. Defendant Generac is a Wisconsin Corporation with headquarters and a registered address located at S45 W29290 Hwy. 59, Waukesha, Wisconsin, 53189.

## FACTUAL ALLEGATIONS

41. At all times relevant to the issues alleged in this Complaint, Defendant was engaged in the business of designing, manufacturing, importing, marketing, labeling, distributing, selling, and/or introducing into interstate commerce the Generac portable generators, including the Products.

42. The Products were marketed as engineered and developed specifically for the rigors of generator use, and as "The #1 Name in Home Backup Generators".[8]

43. Defendant authored and/or approved the information that appears in the Owner's Guide for the Products and on the labels and packaging of the Products.

44. At all relevant times, Defendant has marketed its Products in a consistent and uniform manner.

45. Defendant provides a three-year limited warranty on the Products, which cover any "defects in material and workmanship".[9]

46. Based upon the foregoing, Plaintiffs considered Generac a reputable brand with a strong reputation for producing safe, reliable products and that this generator would be no different.

47. Defendant manufactured and sold the Products as portable generators, and implied that they were suitable for that purpose. However, Defendant failed to disclose that the Products were defective and leaked fuel from the carburetor, posing an unreasonable risk of serious injury or death. The risk associated with the Products was beyond any reasonable or nominal risk that might be associated with generators generally.

---

[8] https://generac.com/about/

[9] https://www.generac.com/globalassets/products/residential/portable-generators/warranty/7675-gp8000e-consense-portable-generator-warranty.pdf

48. Defendant made partial representations to Plaintiffs and Class Members, while suppressing the Defect. Specifically, by displaying the Products and describing their functions and parts, Defendant implied that the Products were suitable and reasonably safe to use as portable generators, without disclosing that they had a critical safety-related defect.

49. Plaintiffs and Class members would not have bought the Products, or would not have bought them on the same terms, if the Defect had been disclosed. The materiality of the Defect is also demonstrated by the existence of the Recall.

50. On April 16, 2026, Defendants issued a recall.

51. As a part of the Recall, CSPC urged consumers of the affected Products to stop using them immediately and to contact "your dealer" to arrange for a free repair at the dealer's location."

52. Consumers who purchased the Products learned through the Recall notice, or by contacting Defendant, that the Products posed a serious and undisclosed safety hazard. Rather than providing a simple remedy, Defendant placed the burden on consumers to arrange, schedule, and travel to undertake significant corrective measures.

53. The steps required by Defendant impose considerable inconvenience and additional costs on Plaintiffs and Class Members, costs that would not have been incurred had the Products been safe and as represented at the time of sale.

54. Because the Products failed to perform as advertised and fell far short of the reasonable expectations of consumers, Plaintiffs and Class Members suffered damages.

55. Although the repair is offered at no charge, consumers are required to verify the Product's model and serial number, locate and contact an authorized dealer, schedule a time for

the repair, and arrange for transportation of the generator[10] to and from the dealer at specified times. The repair process itself imposes substantial burdens, as Plaintiffs and Class Members must arrange and likely pay to transport the generators to and from dealers – wherever they may be located. These corrective measures require significant time and effort and often result in out-of-pocket costs such as potential labor and transportation costs for consumers unable to transport a 200-plus pound generator to and from a dealer.

56. Consumers, including Plaintiffs, reasonably relied on Defendant's representations that the Products were safe and able to be used for their intended purpose, and that they included basic safety features that an ordinary consumer would expect to accompany any residential generator. Defendant misrepresented, concealed, and otherwise omitted material facts that would have been important to Plaintiffs and Class Members in deciding whether to purchase the Products. Defendant intended to, and did, deceive reasonable consumers, including Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members: (a) reasonably relied upon Defendant's misrepresentations and concealment of these material facts and (b) suffered monetary injury as a proximate result of that justifiable reliance.

57. Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions. Indeed, the Defect (a) can cause serious injury and (b), as conceded by Defendant, renders the Products unsuitable for one of their primary features: safely generating and providing electricity.

58. Plaintiffs and the Class Members paid money for the Products, but Plaintiffs and the Class Members did not obtain the full value of the advertised/warranted Products due to

---

[10] Shipping weight of Plaintiff's unit was listed on the Generac specifications sheet as 220 lbs. O

Defendant's misrepresentations and omissions. Had Plaintiffs and Class Members known the truth about the Products, i.e., that they had a serious safety defect, Plaintiffs and Class Members would not have purchased them at the price at which they bought the Products. Consequently, Plaintiffs and the Class Members have suffered injury in fact and lost money as a result of Defendants' wrongful conduct.

59. At all relevant times, Defendant, while concealing the Defect, actively and intentionally misrepresented the qualities and characteristics of the Products. Accordingly, Plaintiffs' and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

60. Defendant misrepresented the Products and concealed the Defect to: (a) sell more units of Products, (b) avoid the costs of a recall, and (c) delay Plaintiffs and Class Members from suing.

61. Due to Defendant's intentional misrepresentations and active concealment of and/or failure to inform Plaintiffs and Class Members of the Defect, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendant's intentional misrepresentations and active concealment stop them from relying on any statutes of limitations.

62. Moreover, Plaintiffs and Class Members did not discover that the Products had a Defect, until Defendant informed them of the Recall after their purchase. Plaintiffs and Class Members had no realistic ability to uncover the Products' Defect given that it involved a defect in workmanship, parts or materials in the Products. Defendant's active concealment of the true nature of the Products hampered Plaintiffs and Class Members' ability to discover their causes of action.

63. The Recall does not render this lawsuit moot because it does not provide all of the same relief available in this lawsuit.

64. First, no refunds are provided, and as a result, this class action seeks monetary relief that the Recall does not provide.

65. Moreover, the Recall was only briefly publicized and in a very limited manner. Therefore, many eligible class members were and remain unaware of it, and the response rate has been low. The amount and reach of the publicity concerning the notice of Recall was not comparable to the typical notice provided in a class action.

## CLASS ACTION ALLEGATIONS

66. Plaintiffs, individually and on behalf of all others similarly situated, brings this class action pursuant to Fed. R. Civ. P. 23.

67. The proposed Class is defined as follows:

**Nationwide Class:** All persons within the United States who purchased Defendants' recalled portable generators sold after May 2025.

**Illinois Subclass:** All persons within the state of Illinois who purchased Defendant's recalled electric generators after May 2025.

**Indiana Subclass:** All persons within the state of Indiana who purchased Defendant's recalled electric generators after May 2025.

**Mississippi Subclass:** All persons within the state of Mississippi who purchased Defendant's recalled electric generators after May 2025.

68. Plaintiffs reserve the right to modify, change, or expand the definitions of the proposed Classes based upon discovery and further investigation.

69. *Numerosity*: The proposed Class is so numerous that joinder of all members is impracticable. CSPC reports indicate that the number of Defendant's products subject to the Recall sold in the United States is approximately 149,900, and though the number of individuals who qualify as class members is likely to approach this figure, the exact number is unknown to Plaintiffs. For example, some class members may have purchased more than one of Defendant's Products. Nevertheless, the precise number of class members can be readily identified through Defendant's records.

70. *Commonality*: Questions of law or fact common to the Class include, without limitation:

a. Whether the Products in question were defective;

b. Whether the defective nature of the Products would be considered material;

c. Whether the defective nature of the Products constitute an unreasonable safety risk;

d. Whether Defendant knew or should have known about the defective nature of the Products;

e. Whether Defendant had a duty to disclose, prior to purchase, the defective nature of the Products to consumers;

f. Whether the defective nature of the products has decreased the value of the Products;

g. Whether Defendant's conduct constitutes an unlawful breach of the implied warranty of merchantability;

h. Whether Defendant's conduct constitutes an unlawful breach of express warranties;

i. Whether Defendant fraudulently omitted material information in its interactions with consumers;

j. Whether Defendant was unjustly enriched; and

k. Whether Plaintiffs and Class members are entitled to damages and/or other monetary relief.

71. *Typicality*: The claims or defenses of Plaintiffs are typical of the claims or defenses of the Class. Class members were injured and suffered damages in substantially the same manner as Plaintiffs, Class members have the same claims against Defendant, and Class members are entitled to relief under the same legal theories asserted by Plaintiffs.

72. *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the proposed Class and have no interests antagonistic to those of the proposed Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions.

73. *Predominance*: Questions of law or fact common to proposed Class members predominate over any questions affecting only individual members. Common questions such as whether Defendant owed a duty to Plaintiffs and the Class and whether Defendant breached its duties predominate over individual questions such as measurement of economic damages.

74. *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of these claims because individual joinder of the claims of the Class is impracticable. Many members of the Class are without the financial resources necessary to pursue this matter. Even if some members of the Class could afford to litigate their claims separately, such a result would be unduly burdensome to the courts in which the individualized cases would proceed. Individual litigation increases the time and expense of resolving a common dispute concerning Defendant's actions toward an entire group of individuals. Class action procedures

allow for far fewer management difficulties in matters of this type and provide the unique benefits of unitary adjudication, economies of scale, and comprehensive supervision over the entire controversy by a single judge in a single court.

75. *Manageability*: Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

76. The Class may be certified pursuant to Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

77. The Class may also be certified pursuant to Rule 23(b)(3) because questions of law and fact common to the Class will predominate over questions affecting individual members, and a class action is superior to other methods for fairly and efficiently adjudicating the controversy and causes of action described in this Complaint.

78. Particular issues under Rule 23(c)(4) are appropriate for certification because such claims present particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## CAUSES OF ACTION

## COUNT I

### Breach of Express Warranty

**(On behalf of the Nationwide Class, or alternatively, the Illinois, Indiana, and Mississippi Subclasses)**

79. Plaintiffs repeat and re-allege the allegations above as if set forth herein.

80. In connection with their sale of the Products, Defendant expressly provided a three-year limited warranty (the "Warranty") that the Products were free from defects in materials and workmanship.

81. Upon information and belief, each one of the Products has an identical or substantially identical Warranty. Each of the Products' owner's guides includes the Warranty.

82. Defendant further warrants that: (a) the Products are portable generators and (b) one can use them as such.

83. The Products are defectively manufactured as alleged, and Defendant's Warranty covers them. Defendant has admitted that: (a) the Products, as sold, are not safe and (b) one cannot use them as generators.

84. Plaintiffs and the Class Members have privity of contract with Defendant through their purchase of the Products from an authorized retailer as stated in the written Warranty that accompanied the purchase and expressly applies to purchasers of the Products.

85. Defendant designed, engineered or manufactured, and marketed the Products.

86. Plaintiffs and the Class Members either: (a) purchased the Products by and through Defendant's authorized sellers for retail sale to consumers or (b) were otherwise expected to be the third-party beneficiaries of Defendant's contracts with authorized sellers, or eventual purchasers, when bought from a third party.

87. Defendant knew or had reason to know of the specific use for which Plaintiffs and the Class Members purchased the Products.

88. The express Warranty was a material part of the bargain between Defendant and consumers. At the time it made this express Warranty, Defendant: (a) knew of the purpose for which consumers, including Plaintiffs and Class Members, would use the products and (b) designed and intended them to be used for that specific purpose.

89. Defendant breached the express Warranty by selling a generator that was neither: (a) free of defects, (b) made for years of safe and dependable operation, (c) made from merchantable material and workmanship, nor (d) capable of being used for the ordinary purpose, suitable and reasonably safe to use as generators.

90. Defendant also breached the express Warranty by selling Products that were defective when made and, thus, contained the Defect on the very first day of purchase, creating a serious safety risk to Plaintiffs and Class Members.

91. The Products that Plaintiffs and each Class Member purchased were subject to the Defect and caused each of them injury because they would not have purchased the Products had they known of the Defect, paid more for the product had they known the Defect, were deprived of the benefit of the bargain by being made to go without the product during its repair.

92. Defendant expressly warranted in writing that it would repair or replace any defect in the Products.

93. Additionally, the UCC specifically provides that the damages associated with breach of warranty are the difference between the product as warranted and the product delivered.

94. Upon information and belief, Defendant received notice and knew of the Defect through customer warranty claims, consumers reporting problems with the Products, customer complaints, and its own internal and external testing.

95. But Defendant failed to provide an adequate remedy. Defendant has offered to provide a "free" repair, but Defendant neither assured consumers that the repair will cure the Defect at issue in this case nor provided reasonable assurance that the problem has been resolved. Moreover, the consumer is required to locate a dealer and schedule a repair, then arrange and schedule transportation to and from the dealer – all at the consumer's time, cost and effort.

96. Accordingly, Plaintiffs and the Class seek damages resulting from the Defect.

97. As a result of Defendants' breach of their express Warranty, Plaintiffs and Class Members have suffered damages.

## COUNT II
**Violation of Wisconsin's Deception Trade Practices Act**
**WIS. STAT. § 100.18(1)**
**(On behalf of the Nationwide Class)**

98. Plaintiff repeats and re-alleges the allegations above as if set forth herein.

99. Defendant engaged in false, deceptive and misleading advertising in violation of Wisconsin's Deceptive Trade Practices Act ("DTPA") as detailed above.

100. Plaintiff and the other Nationwide Class Members reasonably relied upon Defendant's representations that the Products were free from defects.

101. Defendant's violation of the DTPA caused Plaintiff and the other Class members to suffer pecuniary loss. Specifically, Defendant's false, deceptive and misleading advertising caused consumers to purchase Defendant's Products at a price premium believing they were safe and defect free when, in fact, they were not.

102. Because Defendant's advertising program was devised, implemented and directed from Defendant's headquarters in Wisconsin, the DTPA applies to a Class of purchasers of Defendant's Products, both within and outside of Wisconsin, who have been harmed as a result. Moreover, Wisconsin has a substantial interest in preventing false, deceptive and mislead practices within the State which may have an effect both in Wisconsin and throughout the rest of the country.

103. Under the DTPA, Plaintiff Yafchak and the Nationwide Class seek all available remedies, including damages, injunctive relief, restitution, attorney's fees and costs.

## COUNT III

**Violations of the Illinois Consumer Fraud and Deceptive Trade Practices Act 815 ILCS 505/1, *et seq.* ("IFCA") (on behalf of Plaintiff Nason, individually, and the Illinois subclass)**

104. Plaintiff Nason repeats and re-alleges the allegations above as if set forth herein.

105. Defendant is a "person" engaged in "trade or commerce" within the meaning of 815 ILCS 505/1(c), (f).

106. Plaintiff Nason and the Illinois Subclass Members are "persons" and "consumers" under 815 ILCS 505/1(c), (e).

107. The IFCA prohibits engaging in any "unfair or deceptive acts or practices…in the conduct of any trade or commerce…." *See,* IFCA, 815 ILCS 505/2.

108. The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act. *See* 815 ILCS 505/2.

109. Plaintiff Nason and the other Illinois Subclass Members reasonably relied upon Defendant's representations that the Products were free from defects.

110. Defendant's conduct and/or the injury sustained by Plaintiff Nason and the Illinois Subclass Members, as described herein, took place within the State of Illinois and constitute unfair or deceptive acts or practices in trade and commerce, violating 815 ICFA 505/1, *et seq.*

111. Defendant violated the ICFA by representing that the Products have characteristics or benefits that they do not have. *See* 815 ILCS 505/2; 815 ILCS 510/2(7).

112. Defendant did not intend to sell the products as advertised, in violation of 815 ILCS 505/2 and 815 ILCS 510/2(9).

113. Defendant engaged in fraudulent and/or deceptive conduct that creates a likelihood of confusion or misunderstanding in violation of 815 ILCS 505/2; 815 ILCS § 510/2(3).

114. Defendant's deceptive and unfair conduct occurred primarily and substantially in Illinois because:

(a) Defendant marketed, promoted, and sold the Products to Illinois consumers;

(b) Plaintiff Nason used the Product in Illinois;

(c) the injuries were suffered in Illinois; and

(d) the same misrepresentations and omissions were disseminated uniformly to Illinois consumers.

115. Defendant's conduct violates the fundamental Illinois public policy of preventing concealed safety hazards in consumer products.

116. Defendant violated the ICFA by representing that the Products were safe, suitable for household use, and free of material defects, while concealing the known leaking hazard created by the Defect.

117. Defendant's omissions were material because the Defect presented a serious injury safety risk to users and third parties and rendered the Products unfit for their ordinary purpose. No reasonable consumer would purchase a portable generator with a carburetor that might leak fuel and cause a fire or explode, causing serious injuries or death.

118. Prior to selling the Products, Defendant knew or should have known of the Defect, based on reported incidents, warranty claims, engineering evaluations, and internal safety data. Despite this knowledge, Defendant failed to warn consumers or redesign the Products.

119. Defendant's concealment and misrepresentations were likely to, and did, deceive Plaintiff Nason and Illinois Subclass Members. Plaintiff Nason and the Illinois Subclass Members

reasonably relied on Defendant's concealment and misrepresentations.

120. Defendant's conduct, including manufacturing, marketing and selling the defective Products, and the delayed, ineffective and inadequate Recall, constitutes deceptive and unfair business practices under 815 ILCS 505/2 and under the incorporated provisions of the Uniform Deceptive Trade Practices Act, 815 ILCS 510/2.

121. As a direct and proximate result of Defendant's unfair and deceptive acts and omissions, Plaintiff Nason and Illinois Subclass Members suffered ascertainable economic losses, including:

(a) overpayment for unsafe and unmerchantable Products;

(b) loss of the benefit of their bargain

(c) loss of money and property as a result of being unable to use the Products; and

(d) diminished or zero product value due to the Defect and inadequate recall remedy.

122. Had Plaintiff Nason and Illinois Subclass Members known the Products contained a concealed fuel leak hazard, they would not have purchased them or would have paid materially less.

123. Although the Recall confirmed the existence of the Defect, Defendant has provided no monetary relief to Illinois consumers and continues to deny refunds or replacements.

124. Defendant's conduct was intentional, malicious, and demonstrated a reckless disregard for consumer safety, warranting statutory and punitive damages.

125. Under 815 ILCS 505/10a, Plaintiff Nason and the Illinois Class seek all available remedies, including actual damages, statutory damages, punitive damages, injunctive relief, restitution, attorney's fees and costs.

**COUNT IV**
**Negligence**
**(On behalf of Plaintiffs Nationwide Class, or alternatively, the Illinois, Indiana, and Mississippi Subclass)**

126. Plaintiffs repeat and re-allege the allegations above as if set forth herein.

127. At all times relevant, Defendant had a duty to provide Plaintiffs and the other members of the Class with safe Products.

128. Defendant breached this duty by failing to ensure the safety of its Products.

129. As a result of the Recall, Plaintiffs and the other Class Members were harmed in that they suffered economic injury, suffered damage to property, and lost the benefit of the bargain relating to their purchase price of Defendant's Products.

130. Defendant's breach of their duty caused Plaintiffs and the other Class Members damages both proximately and factually.

131. Had Defendant properly designed and manufactured the generator, and properly examined and tested their Products prior to sale, Plaintiffs and the other Class Members would not have been injured and/or damaged as they would not have purchased unsafe products.

132. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been injured and sustained damages.

**COUNT V**
**Unjust Enrichment**
**(On behalf of Plaintiffs Nationwide Class, or alternatively, the Illinois, Indiana, and Mississippi Subclass)**

133. Plaintiffs repeat and re-allege the allegations above as if set forth herein.

134. Defendant represented to Plaintiffs and Class members that their Products were reliable, merchantable, and in good repair.

135. The defect caused the Products to fail to conform to the performance, durability, capability, and reliability that Defendant represented and were therefore of a substantially lesser

quality and value than Defendant represented.

136. Defendant knew or should have known that their Products could not conform to their representations because of the defect.

137. Defendant misrepresented, concealed, and omitted material information.

138. The Defect and the facts misrepresented, concealed, and omitted by Defendant are material because a reasonable consumer would have considered them to be important in deciding whether to purchase their Products.

139. Defendant misrepresented, concealed, and omitted material information concerning the Defect in order to induce Plaintiffs and Class Members to purchase their Products at a substantially higher price than what they would otherwise have paid.

140. Plaintiffs and Class Members reasonably and justifiably relied on Defendant's representations and advertisements when purchasing their Products.

141. Plaintiffs and Class Members would not have purchased the Products if they knew of the Defect, or they would have only paid substantially less.

142. Plaintiffs and Class Members conferred substantial benefits on Defendant by purchasing defective Products at a premium without receiving a product that conformed to Defendant's representations.

143. Defendant knowingly and willingly accepted and enjoyed these benefits.

144. Defendant's retention of these benefits would be inequitable because Defendant obtained benefits to the detriment of Plaintiffs and Class Members when Plaintiffs and Class Members did not obtain their promised benefits.

145. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members are entitled to restitution.

## DEMANDS FOR RELIEF

Plaintiffs demand a trial by jury on all issues.

**WHEREFORE,** Plaintiffs pray that this case be certified and maintained as a class action and for judgment to be entered, against Defendant, by an order that does the following:

(a) certifies the proposed Class and subclasses;

(b) designates Plaintiffs as the class representative, designates the undersigned as class counsel, and requires Defendants to bear the costs of class notice;

(c) enjoins Defendant from selling the Products until: either (a) they can be safely used as generators that meet industry standards or (b) full disclosure of the failure to meet industry standards appears on all packaging;

(d) requires Defendant to engage in: (a) a corrective advertising campaign and (b) any further necessary affirmative injunctive relief, such as recalling the existing Products;

(e) awards: (i) declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein and (ii) injunctive relief to remedy Defendant's past conduct;

(f) requires Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be: (i) an unlawful, unfair, or fraudulent business act or practice; (ii) untrue or misleading advertising; or (iii) a violation of law, plus pre-judgment and post-judgment interest thereon;

(g) requires Defendant to disgorge or return all moneys, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

(h) requires Defendant to pay all actual and statutory damages, permitted under the

counts alleged herein, in an amount to be determined by this Court, but at least $5,000,000;

(i) requires Defendant to pay punitive damages on any count so allowable;

(j) awards attorneys' fees and costs to Plaintiffs and the Classes; and

(k) provides for all other just, proper relief.

Dated: August 31, 2026

Respectfully submitted,

**REESE LLP**

*/s/ Charles D. Moore*
Charles D. Moore
121 Washington Ave. N., 2nd Floor
Minneapolis, Minnesota 55401
Phone: (212) 643-0500
*cmoore@reesellp.com*

**REESE LLP**
Michael R. Reese
(Northern District of Illinois
General and Trial Bar No. 90785808)
5544 Central Avenue
St. Petersburg, Florida 33707
Phone: (212) 643-0500
*mreese@reesellp.com*

**SULTZER & LIPARI, PLLC**
Jason P. Sultzer
85 Civic Center Plaza, Suite 200
Poughkeepsie, New York 12601
Phone: (845) 483-7100
sultzerj@thesultzerlawgroup.com

**POULIN | WILLEY | ANASTOPOULO, LLC**
Paul J. Doolittle (to be admitted pro hac vice)
Andre R. Bèlanger (to be admitted pro hac vice)
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536
Email: paul.doolittle@poulinwilley.com
andre.belanger@poulinwilley.com

*Counsel for Plaintiffs and the Proposed Class*